IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THE COIN-TAINER COMPANY, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 19-CV-234-NJR-RJD |
| | ) |
| PAP-R PRODUCTS COMPANY and | ) |
| PAP-R-TAINER, LLC, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This case is before the Court on the Motion for Preliminary Injunction or Temporary Restraining Order and Default Judgment (Doc. 23) filed by Plaintiff The Coin-Tainer Company, LLC ("Coin-Tainer"), and the Emergency Request for Relief (Doc. 54) filed by Defendants Pap-R-Products Company ("PRP") and Pap-R-Tainer, LLC ("PRT").

**BACKGROUND**

Coin-Tainer filed its Amended Complaint on February 28, 2019, alleging claims of trademark counterfeiting and trademark infringement under 15 U.S.C. § 1114, federal unfair competition and false designation of origin under 15 U.S.C. § 1125(a)(1), and breach of contract under Illinois law (Doc. 14).[1]

Coin-Tainer is a manufacturer of coin and paper currency handling products (*Id.* at p. 3). According to the Amended Complaint, Coin-Tainer is the owner of U.S. federal

---

[1] The Court has federal question jurisdiction over the claims arising under federal law pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the claim arising under state law pursuant to 28 U.S.C. § 1367.

trademark "Coin-Tainer," U.S. Trademark Registration Number 2,227,311, and has common law rights to the Coin-Tainer name, logo, likeness, and related marks in connection with its business (*Id.*).

On February 23, 2015, Coin-Tainer entered into a joint venture with PRP to form PRT, and each held 50% of the membership interest in PRT (*Id.* at pp. 5-6). Shortly thereafter, the parties' business relationship deteriorated, and litigation ensued in Illinois state court (*Id.*). Coin-Tainer and PRP entered into a written settlement agreement ("the Settlement Agreement") in October 2018, whereby Defendants purchased Coin-Tainer's interest in PRT for $200,000 (*Id.* at p. 7).

Coin-Tainer alleges it retained its corporate identity, Federal Tax ID number, goodwill, tradenames and trademark, vendor relations, vendor status, decision making, and authority (*Id.*). Defendants were granted a limited, exclusive right to use the Coin-Tainer marks, names, and likeness until December 31, 2018 (*Id.*). After that date, Coin-Tainer could reenter the market, using its marks, names, and likeness, and Defendants would not ship any products containing the name "Coin-Tainer" or "The Coin-Tainer Company" (*Id.*). Coin-Tainer alleges it performed its obligations under the Settlement Agreement by not competing through this date, but since reentering the marketplace on January 1, 2019, has faced unfair competition, trademark violations, confusion in the marketplace, and other unfair and deceptive actions on behalf of Defendants (*See* Doc. 14). Coin-Tainer alleges it has evidence Defendants continued using Coin-Tainer's tradename and likeness after December 31, 2018, in violation of the Settlement Agreement (*Id.* at p. 8). Coin-Tainer also alleges Defendants are wrongfully using its GS1 Company

Prefix and barcodes ("the GS1 Codes") (*Id.* at p. 9).[2]

On April 4, 2019, Coin-Tainer filed a motion for a temporary restraining order ("TRO"), a preliminary injunction, and default judgment (Doc. 22). Coin-Tainer seeks an order enjoining Defendants from (1) using the Coin-Tainer marks, name logo, and trade dress; (2) using Coin-Tainer's GS1 Codes; and (3) doing business under Coin-Tainer's vendor status, vendor numbers, and vendor agreements ("the Vendor Relationship Asset") (Doc. 23).

A hearing was held on Coin-Tainer's motion on April 11, 2019 (Doc. 47). The Court denied Coin-Tainer's motion as to default judgment, and took the remaining issues of a TRO and preliminary injunction under advisement, pending additional briefing from the parties (*Id.*).[3]

On April 23, 2019, Defendants filed an Emergency Request for Relief Due to New Information after receiving a letter from GS1 US (Doc. 54). GS1 US stated it suspended the use of the GS1 Company Prefix until "(1) a court of competent jurisdiction issues a valid order resolving the disputes" or "(2) GS1 US in its sole and exclusive discretion

---

[2] GS1 US is a not-for-profit organization that collaborates with businesses to encourage GS1 Standards that "provide a common language and help to create seamless work processes that allow businesses to identify, capture, and share information the same way all over the world." GS1 US, *What We Do*, (Apr. 25, 2019), https://www.gs1us.org/what-we-do/overview#. GS1 Standards include GS1 barcodes, which "encode information such as product numbers, serial numbers and batch numbers." GS1 US, *Standards*, (Apr. 25, 2019), https://www.gs1.org/standards/barcodes. These barcodes "play a key role in supply chains, enabling retailers, manufacturers, transport providers and hospitals to automatically identify and track products as they move through the supply chain." *Id.* Global Location Number ("GLN") are used by companies to identify their location. *Id.* The first step in obtaining GS1 barcodes is obtaining a GS1 Company Prefix, which is "a unique string of digits assigned to [a] company, identifying [it] as the manufacturer throughout the entire product supply-chain." GS1-US INFO, *The Four Easy Steps for Obtaining a UPC Barcode*, (Apr. 25, 2019), https://www.gs1-us.info/company-prefix/.

[3] Defendants' counsel entered his appearance shortly after Coin-Tainer filed its motion for injunctive relief and default judgment (Doc. 28). Defendants filed a response in opposition to the motion (Doc. 46) and were granted additional time to respond to the Amended Complaint (Doc. 53).

determines to reinstate the Company Prefix after a complete investigation" (Doc. 42, Ex. 2). According to Defendants, Joseph Vierling, PRT's court-appointed Receiver, directed GS1 US to transfer the GS1 Company Prefix to PRT via a letter dated February 28, 2019 (Doc. 1). GS1 US acknowledged it was in receipt of Vierling's letter but was aware of the litigation in this Court over the GS1 Codes (*Id.*).[4] Defendants argue the suspension of the GS1 Codes is the result of Coin-Tainer's interference, and Coin-Tainer has obstructed the transfer of the GS1 Codes without legal justification (Doc. 54). Defendants request the Court deny Coin-Tainer's motion for a TRO and preliminary injunction and order that Defendants are permitted to use the GS1 Codes until further notice.

## DISCUSSION

Preliminary injunctions are extraordinary and drastic remedies that should not be granted unless the movant makes a clear showing that it has carried its burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Under Federal Rule of Civil Procedure 65, the party moving for an injunction has the burden of showing that it has some likelihood of succeeding on the merits, that no adequate remedy at law exists, and that it will suffer irreparable harm in the interim period prior to final resolution of its claims. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the movant establishes these elements, the Court must then balance the potential harm to the movant if the preliminary injunction were wrongfully denied, against the potential harm to the non-movant if the injunction were wrongfully

---

[4] The letter was dated March 25, 2019, but postmarked April 17, 2019 (Doc. 54, Ex. 3). Defendants' counsel spoke to a paralegal at GS1 US, who stated the letter was not mailed until April 17 due to understaffing (*Id.*).

granted. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). The Court should also take into consideration the effect that granting or denying the injunction will have on the public. *Girl Scouts*, 549 F.3d at 1086.

For purposes of a preliminary injunction, Coin-Tainer must show that it has a "batter than negligible" chance of succeeding on the merits of its claims. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001). To succeed on its claims of trademark infringement and counterfeiting under 15 U.S.C. § 114, or unfair competition (or false designation) under 15 U.S.C. § 1125(a)(1)(A), Coin-Tainer must prove (1) its mark is protected under the Lanham Act; and (2) Defendants' use of the mark is likely to cause confusion among consumers. *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008). "But where the trademark holder has authorized another to use its mark, there can be no likelihood of confusion and no violation of the Lanham Act if the alleged infringer uses the mark as authorized." *Id.*

To succeed on its breach of contract claim under Illinois law, Coin-Tainer must prove (1) the existence of a valid and enforceable contract, (2) substantial performance by Coin-Tainer, (3) breach of contract by Defendants, and (4) resulting injury to Coin-Tainer. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015).

Coin-Tainer seeks three injunctions: (1) an injunction preventing Defendants from using the Coin-Tainer name, (2) an injunction preventing Defendants from using the GS1 Codes, and (3) an injunction preventing Defendants from doing business under the Vendor Relationship Assets. Each will be evaluated in turn.

### I. The Coin-Tainer Name

The parties do not contest that Coin-Tainer has a registered word mark for "Coin-Tainer" with the registration number 2,227,311, for use on "paper products" ("the Mark"). The parties also agree that, under the Settlement Agreement, Defendants could not ship products bearing Coin-Tainer's name after December 31, 2018. Also, the parties do not contest that the Settlement Agreement is valid and enforceable, or that Coin-Tainer substantially performed under the Settlement Agreement by refraining from reentering the marketplace prior to January 1, 2019.

But Defendants argue Coin-Tainer cannot show a likelihood of success on the merits because Defendants were authorized to use Coin-Tainer's name pursuant to the Settlement Agreement. The Settlement Agreement provides,

> CT shall grant PRP and/or PRT a temporary, exclusive, royalty-free license to use the name "Coin-Tainer" and "The Coin-Tainer Company" through December 31, 2018. . . The Parties further understand that some PRP/PRT products identified as "Coin-Tainer" product will remain in vendors' inventory and on vendors' shelves past December 31, 2018 and that this shall not be deemed a violation of [the Settlement Agreement]. PRT/PRP will not ship any products containing the name "Coin-Tainer" or "The Coin-Tainer Company" after December 31, 2018

(Doc. 14, p. 19).

Coin-Tainer agrees Defendants had a limited right to use the Mark until December 31, 2018, but argue that Defendants violated the Settlement Agreement by shipping products bearing the Mark past that date. Coin-Tainer also alleges that Defendants have falsely represented to customers that the Coin-Tainer brand was transitioning to the PRP brand, and as a result, have suffered injury to their brand and unfair competition.

Coin-Tainer submitted a declaration from its sole owner, David Walters, in which Walters states he received correspondence from confused customers in early 2019

(Doc. 24). Specifically, Walters sent an email to Essendant, a customer, asking to set up a time to discuss their business relationship, (Doc. 24, Ex. 1, p. 17). Walters also sent an email to another customer explaining Coin-Tainer entered into a short-lived joint-venture with PRP, but would be reestablishing business as "Coin-Tainer" in 2019 (*Id.* at pp. 18-19). Walters attached the emails to his declaration (*Id.* at pp. 17-19). Walters states the buyer at Essendant contacted him shortly after receiving the email, and told Walters he believed he was already doing business with Coin-Tainer, and that Coin-Tainer's sales representative told him the Coin-Tainer brand was changing to PRP in 2019 (Doc. 24, p. 9). Walters states he also spoke with someone at SP Richards, who informed Walters he received a letter from Defendants in fall of 2018, saying Defendants "were going to be owning the Coin-Tainer brand" (*Id.* at p. 10). Michael Walters, Coin-Tainer's sales representative and the son of David Walters, executed a declaration stating he was present for David Walters's conversations with customers (Doc. 25, p. 5). Michael Walters described the conversations consistent with David Walters's description (*Id.*).

David Walters also claims in his declaration that he has photographic evidence Defendants shipped products bearing the Mark after December 31, 2018 (Doc. 24, p. 10). Walters submitted a copy of a photo taken at a Walgreens in Minnesota on March 7, 2019, depicting products with Coin-Tainer's trademarked packaging, labeling, brand, and GS1 Codes (Doc. 24, pp. 9-10; Doc. 42, Ex. 1, p. 20). Walters thinks it is highly unlikely the products were shipped prior to January 1, 2019 because stores sell approximately one unit each week, and Walgreens holds a maximum of four bags on the shelf and are replenished weekly (Doc. 24, p. 11). Walters submitted copies of photos taken at a Target

in Minnesota on March 7, 2019, depicting products bearing the Coin-Tainer logo (Doc. 24, p. 11; Doc. 24, Ex. 1, p. 21). Walters believes it is highly unlikely the products could have been shipped prior to January 1, 2019 (Doc. 24, p. 11). Walters also submitted a photo taken at a Target in Minnesota on March 14, 2019, depicting products bearing the Coin-Tainer logo (Doc. 24, p. 11; Doc. 24, Ex. 1, p. 22). Walters states the store was out of stock of the product on March 10, 2019, so it is highly unlikely the products were shipped prior to January 1, 2019 (Doc. 24, p. 11). Walters attached another photo of products bearing the Coin-Tainer's name that was taken at a Target in Minnesota on March 20, 2019 (Doc. 24, p. 11; Doc. 24, Ex. 1, p. 23). He believes it is highly unlikely the products shipped prior to January 1, 2019 (Doc. 24, p. 11). Walters also attached three photos a customer sent him on March 22, 2019, that depict products the customer received on March 18, 2019 that bear the Coin-Tainer logo (Doc. 24, p. 12; Doc. 24, Ex. 1, pp. 24-26). Again, Walter states it is highly unlikely the products shipped prior to January 1, 2019 (Doc. 24, p. 12).

Finally, David Walters submitted a copy of an email he received from a customer in March 2018, complaining about a product (Doc. 24, Ex. 1, p. 27). Walters states that the email evidences customer confusion, because the customer complained to Walters and not Defendants (Doc. 24, p. 13).

According to Michael Walters's declaration, he also received an email from a customer in March 2019 regarding a product complaint, which shows confusion in the marketplace (*Id.* at p. 6). A copy of the email is attached to the declaration (Doc. 25, Ex. 1).

Defendants argue that the Walters's declarations are nothing more than unreliable hearsay. They contend David Walters's allegations that it is "highly unlikely" products

bearing the Coin-Tainer shipped prior to January 1, 2019 are conclusory and unsupported. Defendants argue that their intentional use of the Mark would be "nonsensical." Continual use of that brand would defeat Defendants' goal of promoting the PRT brand. Defendants provided a declaration from Scott Ware, the sole owner of PRP (Doc. 50, Ex. 1). Ware states he wants to distance Defendants' brand from the Coin-Tainer name, because Coin-Tainer is involved in litigation that is harmful to its reputation (*Id.*). Ware further states that after the Settlement Agreement, Defendants started rebranding their products to transition away from the Coin-Tainer name (*Id.*). Defendants contacted their employees in charge of the relevant manufacturing and shipping facilities to inform them of the obligations to no longer use or ship anything bearing the Coin-Tainer marks (*Id.*). John Reiter, Defendants' sales representative, also executed a declaration stating that in late 2018, he began a concentrated effort to inform PRT's existing customers that it would no longer be doing business under the "Coin-Tainer" brand as of January 1, 2019 (Doc. 50, Ex. 4). Reiter attached copies of emails between him and customers, informing them of the change (Doc. 50, Ex. 5).

It is well established that a Court may consider hearsay at the preliminary injunction stage, *In re Amer quest Mortgage Co.*, No. 05-CV-7097, MDL No. 1715, 2006 WL 1525661, at *3 (N.D. Ill. May 30, 2006) (and cases cited therein), although any evidence must be weighed in light of "the characters and objectives of the injunctive proceeding," *Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 26 (1st Cir. 1986). Here, the evidence Coin-Tainer has set forth consists mostly of hearsay, offered by a highly interested party. David Walters is the sole owner of Coin-Tainer who, as the record demonstrates, has been

involved in contentious litigation over the failed business relationship between him and Defendants. This evidence is largely unreliable, and is insufficient to support a TRO or a preliminary injunction, which are extraordinary remedies. But even if Coin-Tainer demonstrated a likelihood of success on the merits, Coin-Tainer cannot show irreparable harm or the lack of an adequate remedy at law.

The Seventh Circuit has held that that irreparable harm is generally presumed in cases of trademark infringement cases. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000). But the Supreme Court's decision in *eBay v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), calls this notion into question. In *eBay*, the Court held that irreparable harm is not presumed in patent infringement cases for injunctive relief, because the Patent Act does not provide an exception from the traditional requirement that a movant must show evidence of irreparable harm before securing an injunction. *Id.* at 391-92. The Seventh Circuit has not yet addressed this issue, but the Lanham Act, like the Patent Act, does not include an exception from traditional standards for injunctive relief. 15 U.S.C. § 116(a). The Lanham Act provides that injunctive relief should be granted "according to the principles of equity." *Id.* Accordingly, "it seems likely that *eBay* would apply with equal force to trademark cases." *Timothy B. O'Brien LLC v. Knott*, 18-cv-684-jdp, 2018 WL 5456550, at *5 (W.D. Wis. Oct. 29, 2018). Coin-Tainer must show it will suffer irreparable harm absent and injunction and that no adequate remedy exists at law.

Defendants have taken steps to prevent the use of the "Coin-Tainer" name, which weakens Coin-Tainer's position that it will suffer irreparable harm. *See Creative Labs, Inc. v. Mad Dog Multimedia, Inc.*, No. C 02-4575 SI, 2002 WL 32068970, at *3 (N.D. Cal. Oct. 3,

2002) ("Given that defendant has undertaken to stop using the mark . . . and to change its packaging, and given the substantial disparity in market share between the two parties, the Court find that plaintiffs have not made a strong showing of irreparable injury for purposes of the requested [TRO].").

Defendants submitted a declaration from Reiter, its sales representative, describing the efforts Defendants have taken to distance their brand from the Coin-Tainer name. Reiter bolstered the veracity of his declaration by providing copies of emails between himself and Defendants' customers, explaining Defendants' transition away from Coin-Tainer. Although Coin-Tainer may have encountered some confused customers, the parties contemplated this would happen in their Settlement Agreement:

> To prevent confusion, CT shall not use the names "Coin-Tainer" or "The Coin-Tainer Company" in the United States marketplace through December 31, 2018. . .The Parties understand that vendors have already printed product catalogs for 2019 and that those catalogs describe certain PRT/PRP products as "Coin-Tainer" products, which is out of the control of PRP/PRT at this time and which shall not be deemed a violation of [the Settlement Agreement]. . . .The Parties further understand that some PRP/PRT products identifies as "Coin-Tainer" products will remain in vendors' inventory and on vendors' shelves past December 31, 2018 and that this shall not be deemed a violation of this [Settlement Agreement].

(Doc. 14, p. 19).

In sum, Coin-Tainer has not met its burden of establishing its entitlement to a TRO or a preliminary injunction because it has not shown a likelihood of success on the merits, irreparable harm, or that there is no adequate remedy at law.

## II. The GS1 Codes / Vendor Relationship Assets

Coin-Tainer also seeks an injunction that prevents Defendants from using the GS1 Codes and the Vendor Relationship Assets. Alternatively, Defendants move for an Order

that gives them rights to use the GS1 Codes and Vendor Relationship Assets until further notice.

The GS1 Codes and Vendor Relationship Assets were initially owned by Coin-Tainer, but the parties dispute whether Defendants acquired the GS1 Codes and Vendor Relationship Assets when PRP and Coin-Tainer formed PRT. In the contracts establishing PRT, Coin-Tainer agreed to contribute virtually all of its assets to the joint venture. Defendants argue Coin-Tainer's contribution included the GS1 Codes and Vendor Relationship Assets, and that Defendants retained them under the terms of the Settlement Agreement.

Schedule B of PRT's Operating Agreement is titled "Initial Capital Contribution of Members" (Doc. 46, Ex. 2). Schedule B provides that Coin-Tainer agreed to make a capital contribution consisting of "[t]angible and intangible assets described in the Contribution Agreement between the Member and the Company dated February 23, 2015" (*Id.* at p. 40). In the Contribution Agreement, the parties agreed to "contribute, assign, sell, transfer, convey and deliver to the Company all of its right, title and interest in and to the Contributed Assets" (*Id.* at p. 45). The Contribution Agreement defines "Contributed Assets" as

> all of the Member's right, title and interest in and to all of the assets, rights and properties used or held for use in connection with the operation of the Member's business as of the Closing Date, including . . (f) all items of Intellectual Property owned by the Member . . . ; (g) all trade accounts receivable and other rights to payment from customers, all other accounts or notes receivable, and any claims, remedies and other rights related to any of the foregoing; [and] (h) all books, record, files, data and other materials (in any form or medium), including all financial and accounting records, sales and promotional materials, price lists, customer lists, supplier lists, purchase order, research and development files. . .

(*Id.* at pp. 42-43).

The Contribution Agreement describes "Intellectual Property" as

> all of the following anywhere in the world and all legal rights, title or interest in the following arising under Law: (a) all patents and applications for patents and all related reissues, reexaminations, divisions, renewals, extensions, provisionals, continuations and continuations in part, (b) all copyrights, copyright registrations and copy right applications, copyrightable works and all other corresponding rights . . . (d) all trade dress and trade names, logos, Internet addresses and domain names, trademarks and service marks and related registrations and applications . . . (e) . . . business and marketing plans, advertising and promotional materials, customer, distributor, reseller and supplier lists and information, correspondence, records and other documentations and other proprietary information of every kind . . . and (h) all other intellectual property rights.

(*Id.* at p. 44).

The Settlement Agreement provides that, in exchange for $200,000, PRP would purchase Coin-Tainer's interest in PRT, which includes all of the Coin-Tainer assets and liabilities of PRT (Doc. 14, pp. 18-19). The Settlement Agreement only states that "PRP and PRT shall return anything using the names 'Coin-Tainer' and 'The Coin-Tainer Company,' and CT shall have sole rights to all variations of the CT trade names" on January 1, 2019 (*Id.* at p. 19).

Coin-Tainer argues that it did not, and could not, sell the GS1 Codes to Defendants, because the codes are like Social Security Numbers for businesses. Coin-Tainer states the codes can only be transferred upon the sale of a business, the sale of a business line, or a merger with another company. The GS1 US website confirms, "A GS1 Company Prefix can be transferred upon the sale of a business, the sale of a business line,

or the merger with another company."[5] Coin-Tainer also argues that Defendants' use of the GS1 Codes violate GS1 US policies.

Defendants argue there was, in fact, a "sale of a business line" when Coin-Tainer agreed to contribute all of its business assets to the joint venture. Coin-Tainer contests this point. David Walters's declaration explains that PRT was created as an umbrella company and Coin-Tainer and PRP were expected to operate independently (Doc. 51, Ex. 3). According to Walters, each company invoiced its own customers, collected receivables for those customers, and purchased its own materials (*Id.*). Walters says PRT did not have employees, did not makes sales, did not have or use the GS1 Codes, and only existed as an accounting function (*Id.*).

Defendants paint a dramatically different picture. They assert they have been using the GS1 Codes since 2015, when the parties formed PRT, and shared responsibilities over selling products. Ware states in his declaration that PRT operated a legacy Coin-Tainer division in Minnesota and a legacy PRP division in Illinois (Doc. 50. Ex. 1). The legacy Coin-Tainer division sold bagged coin wrappers and raffle ticket rolls, while the legacy PRP division sold commercial coin wrappers and currency bands (*Id.*). Ware also states that Michael Walters insisted that PRT use the GS1 Codes in the joint venture to avoid incurring tens of thousands of dollars of costs in inventory, labor, and goodwill (*Id.*).

Vierling also declares Defendants used the GS1 Codes and Vendor Relationship Assets (Doc. 50, Ex. 2). According to Vierling, he had no relationship with the parties at

---

[5] GS1 US, *GS1 Company Prefix Transfer Request*, (Apr. 25, 2019), https://www.gs1us.org/what-we-do/membership/member-resources/mergers-acquisitions.

the time of his appointment as PRT's Receiver (*Id.*). He explains that during his tenure as PRT's Receiver, PRT used the tangible and intangible assets transferred to PRT by Coin-Tainer in 2015, including the GS1 Codes and Vendor Relationship Assets (*Id.*). Vierling states that under the Settlement Agreement, PRT retained the rights to use these assets and did use them under his direction (*Id.*).

Defendants also point out they paid the annual fee to renew the GS1 Codes until this past year. A declaration from Jerome Williams, Defendants' Chief Financial Officer, states, "Starting in 2015, PRT paid . . . to renew PRT's ability to use its GS1 codes. PRT issued checks . . . on October 15, 2015, September 27, 2016, and September 15, 2017" (Doc. 50, Ex. 6). Williams states he did not receive an invoice for the GS1 Codes for 2018 (*Id.*). Defendants argue this is because David Walters failed to forward the invoice to Vierling or Williams.

David Walters declares he discussed the renewal notice for the GS1 Codes with Vierling on multiple occasions, and Defendants failed to pay the invoice (Doc. 24, pp. 13-14). Walters states he was forced to pay the invoice out of his personal funds on behalf of Coin-Tainer (*Id.* at p. 14).

But Vierling denies that Walters ever contacted him about the invoice (Doc. 50, Ex. 2). Vierling says,

> At no time in 2018 did David Walters ever speak with me or otherwise communicate with me about a GS1 company prefix renewal or an invoice for that renewal, nor did he ever request payment or reimbursement for any such renewal. If he had done so, I would have instructed that the invoice be paid by PRT

(*Id.*).

The controversy surrounding the GS1 Codes and Vendor Relationship Assets is

convoluted, to say the least. Overall, the declarations the parties have submitted present drastically different versions of the events. At this juncture, the most appropriate course of action is to maintain the status quo. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas Camelish*, 451 U.S. 390, 395 (1981). Defendants were using the GS1 Codes and Vendor Relationship Agreements at some recent point in time, and they have provided evidence they have been using them for much longer. While Coin-Tainer argues that Defendants' use of the GS1 Codes violate GS 1 US policies, this issue is not a matter for the Court to decide. The Court is tasked with determining which party owns the GS1 Codes, and until this question is resolved on the merits or the Court orders otherwise, Defendants are entitled to continue using the GS1 Codes.

## CONCLUSION

For these reasons, the Motion for Preliminary Injunction or Temporary Restraining Order and Default Judgment (Doc. 22) is **DENIED without prejudice**. The Emergency Request for Relief (Doc. 54) is **GRANTED** to the extent Pap-R-Tainer, LLC is permitted to use the GS1 Codes until a decision regarding ownership of the codes is reached on the merits, or until this Court orders otherwise.

**IT IS SO ORDERED.**

**DATED:** April 26, 2019

s/ *Nancy J. Rosenstengel*
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**