# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **THE COIN-TAINER COMPANY, LLC,** <br><br> Plaintiff, <br><br> v. <br><br> **PAP-R PRODUCTS COMPANY, PAP-R-TRAINER, LLC, and SCOTT WARE,** <br><br> Defendants. | Case No. 19-CV-00234-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion to Dismiss ("MTD") Plaintiff Coin-Tainer Company's ("CT") second amended complaint ("SAC") filed by Defendants Pap-R Products Company ("PRP") and Pap-R-Tainer, LLC ("PRT") (Doc. 59). Defendant Scott Ware, who was added to the suit in the SAC, later joined PRP and PRT in their MTD by filing his own Motion (Doc. 73). For the reasons set forth below, the Court denies the Motions.

### FACTUAL & PROCEDURAL BACKGROUND

This action arises out of claims brought by CT seeking injunctive relief for alleged violations of federal laws relating to intellectual property and commercial competition, along with breach of the parties' previous settlement agreement ("the agreement") (Doc. 57). CT is a manufacturer of coin and paper currency handling products (*Id.* at p. 3). According to the SAC, CT is the owner of U.S. federal trademarks, including "Coin-Tainer," U.S. Trademark Registration Number 2,227,311, and has common law rights to

the CT name, logo, likeness, and related marks in connection with its services provided in the paper, coin, and currency handling field (*Id.* at p. 3-4). On February 23, 2015, CT entered into a joint venture with PRP to form PRT (*Id.* at p. 6). Shortly thereafter, the parties reached an impasse on the affairs of PRT, and the joint venture went south. (*Id.*). Predictably, litigation then ensued in Illinois state court (*Id.*).

In an effort to resolve their disputes, CT and PRP entered into the agreement, whereby Defendants purchased CT's interest in PRT (*Id.* at p. 7).[1] CT granted Defendants a limited, exclusive right to use the CT marks, names, and likeness until December 31, 2018 (*Id.* at p. 8). After that date, CT could reenter the market, using its marks, names, and likeness, and Defendants would not ship any products containing the name "Coin-Tainer" or "The Coin-Tainer Company" (*Id.*). CT alleges it retained its good will, tradenames, trademark, vendor relations, and vendor status (*Id.* at p. 7-8). According to the SAC, the agreement provides, in part,

> CT shall grant PRP and/or PRT a temporary, exclusive, royalty-free license to use the name "Coin-Tainer" and "The Coin-Tainer Company" through December 31, 2018. . . . To prevent confusion, CT shall not use the names "Coin-Tainer" or "The Coin-Tainer Company" in the United States marketplace through December 31, 2018. On January 1, 2019, PRP and PRT shall return anything using the names "Coin-Tainer" and "The Coin-Tainer Company" and CT shall have sole rights to all variations of the CT trade names.
>
> The Parties understand that vendors have already printed product catalogs for 2019 and that those catalogs describe certain PRT/PRP products as "Coin-Tainer" products, which is out of the control of PRP/PRT at this time and which shall not be deemed a violation of this Paragraph 5. PRP/PRT will submit updated information to vendors for use in their 2020 catalogs that does not include the names "Coin-Tainer" or "The Coin-Tainer

---

[1] The parties do not appear to contest that the agreement is valid and enforceable.

Company." The Parties further understand that some PRP/PRT products identified as "Coin-Tainer" products will remain in vendors inventory and on vendors' shelves past December 31, 2018 and that this shall not be a violation of this Paragraph 5. PRT/PRP will not ship any products containing the name "Coin-Tainer" or "The Coin-Tainer Company" after December 31, 2018.

(*Id.* at p. 8). CT alleges it performed its obligations under the agreement by not competing through December 2018, but since reentering the marketplace in January 2019, it has faced unfair competition, trademark violations, confusion in the marketplace, and other unfair and deceptive actions perpetrated by Defendants (*See* Doc. 57). CT alleges it has uncovered evidence that Defendants continued using CT's tradename and likeness after December 31, 2018, in violation of the agreement (*Id.* at p. 9).

After this Court denied CT's Motion for Preliminary Injunction or Temporary Restraining Order and Default Judgment (Doc. 56), CT filed its SAC, adding Ware, the sole shareholder and President of PRP, as a defendant (Doc. 57). PRP and PRT filed an MTD for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and for a lack of legal sufficiency under Rule 12(b)(6). In the motion, PRP and PRT argue CT lacked standing[2] to file its Lanham Act claims; failed to state a claim for counterfeiting; and

---

[2] PRP and PRT are not referring to Article III standing; they instead are referring to the argument that CT did not satisfy the statutory requirements for a Lanham Act claim. The Seventh Circuit has held that whether a party has sufficiently alleged its right to enforce a copyright is properly addressed as a merits issue under Rule 12(b)(6), not as a jurisdictional issue under Rule 12(b)(1). *See HyperQuest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377, 381 (7th Cir. 2011) (explaining that "the Copyright Act spells out who has enforceable rights under the statute," and that "someone who does not" have an enforceable copyright "has failed to state a claim upon which relief may be granted," which results in dismissal under Rule 12(b)(6)); *see also Grede v. Bank of N.Y. Mellon*, 598 F.3d 899, 900 (7th Cir. 2010) ("Whether a given action is within the scope of [a statute] is a question on the merits rather than one of justiciability.").

failed to state a claim regarding the ownership of GS1 Codes[3] and the Vendor Agreement (Docs. 59, 60). CT then filed a memorandum in opposition to the MTD, and Ware filed his own motion joining PRP and PRT in their MTD (Docs. 61, 73).

## LEGAL STANDARD

PRP, PRT, and Ware move to dismiss the second amended complaint under Rule 12(b)(6). Taken together, the factual allegations contained within a complaint must "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554-55 (2007) (internal citations omitted); *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[T]rial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."). Complaints that contain only "naked assertion[s] devoid of further factual enhancement" will not suffice. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

Further, courts "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). On the other hand, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a

---

[3] GS1 US is a not-for-profit organization that collaborates with businesses to encourage GS1 Standards that "provide a common language and help to create seamless work processes that allow businesses to identify, capture, and share information the same way all over the world." GS1 US, *What We Do*, (Mar. 2, 2020), https://www.gs1us.org/what-we-do/overview#. GS1 Standards include GS1 barcodes, which "encode information such as product numbers, serial numbers and batch numbers." GS1 US, *Standards*, (Mar. 2, 2020), https://www.gs1.org/standards/barcodes.

motion to dismiss [during the pleading stage] we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 889 (1990)).

## ANALYSIS

I. **Lanham Act Claims**

   A. **Applicable Law**

"Congress passed the Lanham Act in 1946 to 'federalize' existing common law protection of trademarks used in interstate commerce." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 672 (7th Cir. 2001) (quoting *Peaches Enter. Corp. v. Repertoire Assocs., Inc.*, 62 F.3d 690, 692 (5th Cir. 1995)). Under Section 32 of the Lanham Act (15 U.S.C § 1114), a defendant is liable for federal trademark infringement and counterfeiting if the defendant, (1) without consent, (2) used in commerce, (3) a reproduction, copy, or colorable imitation of plaintiff's registered mark, as part of the sale or distribution of goods or services, and (4) that such a use is likely to cause confusion. *See* 15 U.S.C. § 1114[1][a]). In order to succeed on a trademark infringement and counterfeit claim, a plaintiff must allege "(1) that its mark is protectable, and (2) that the defendant's use of that mark is likely to cause confusion among consumers." *Phoenix Ent. Partners v. Rumsey*, 829 F.3d 817, 821 (7th Cir. 2016). Registration of a trademark allows the owner to sue an infringer under Section 32 and creates a presumption that the mark is valid. *See* 15 U.S.C. § 1057.

The language of 15 U.S.C. § 1114(1) has been held to be clear in limiting standing only to the owner of the trademark, its "legal representatives, predecessors, successors, and assigns." 15 U.S.C. § 1127; *Specht v. Google Inc.*, 747 F.3d 929, 933 (7th Cir. 2014). Accordingly, the plaintiff must be the owner of a registered mark to bring an infringement claim under 15 U.S.C. § 1114. But ownership of a mark becomes murky when it changes hands because a registered trade name or mark cannot be conveyed independently of the good will that it symbolizes. 15 U.S.C. § 1060(a)(1). This type of invalid conveyance is called an assignment-in-gross.

### B. Discussion

PRP and PRT allege that CT does not have ownership of the Coin-Tainer mark because the conveyance of the mark in the agreement was an assignment-in-gross. This would mean that CT does not have standing to enforce the mark and, therefore, its lawsuit could not move forward. To support this claim, PRP and PRT outline the transfer of the mark and good will from CT to PRT in the joint venture contracts that formed PRT (Doc. 60, p. 4). PRP and PRT go on to claim that when the venture failed, the agreement and behavior between the parties did not show that they intended to transfer the good will associated with the mark back to CT. They specifically state that no part of the agreement contemplated the transfer of the good will associated with the mark because the agreement did not transfer prior trademark rights or priority of use (*Id.* at p. 4). They further state that they, under the assumption they still owned the good will, took steps to ensure the preservation of the good will by communicating with customers to preserve it (*Id.* at p. 6). PRP and PRT also make a second argument that CT is not well positioned

in the marketplace to safeguard continuity in the "production, nature, and quality of the goods associated with the mark" (*Id.* at p. 7).

CT claims it has the registered mark for "Coin-Tainer" for use on "paper products." CT asserts that it merely gave PRT a license to use its mark. CT adds that under the agreement, PRP and PRT could not ship products bearing the Coin-Tainer name after December 31, 2018.

While there may be questions about whether CT merely licensed the mark to PRT and, if not, whether good will was transferred with the mark back to CT after the joint venture went south, CT has managed to plead enough facts to plausibly suggest that it has the standing to pursue its Lanham Act claims. Construed in favor of CT, the complaint alleges facts that make it plausible that CT owns the mark and only gave a limited license to PRT to use its mark. CT achieves this by not just asserting that a limited license was given, but also including the language used in the agreement that acknowledges the license. The agreement between the parties states that "CT shall grant PRP and/or PRT a temporary, exclusive, royalty-free license to use the name 'Coin-Tainer' and 'The Coin-Tainer Company' through December 31, 2018," which does, to some degree, connote ownership of the mark (Doc. 57, p. 8). Simply put, CT's complaint does not display the collection of conclusory statements without more that *Twombly* and *Iqbal* contemplated as problematic in pleading standards.

Next, PRP and PRT argue that CT has not alleged facts sufficient to show that its Lanham Act counterfeit claim against them is plausible. In order to be "counterfeit," the goods must have been produced by an entity that was not authorized to use the mark at

the time the goods were manufactured. 15 U.S.C. § 1116(d)(1)(B). The goods must also bear "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.

In order to solidify their claim, PRP and PRT lock on to the "authorized at the time of manufacture" element of a counterfeit violation. PRP and PRT claim that factory overruns are protected from counterfeiting claims when the products associated are shipped and hit the market, even if the license to manufacture has expired when they are shipped and sold. Thus, PRP and PRT assert that CT needs to plead facts that show that it is plausible that they manufactured the products in question after their license expired, not that they were shipped and sold after expiration. Indeed, the type of factory overrun before license expiration is not a counterfeit violation under the Lanham Act. *See All Star Championship Racing, Inc. v. O'Reilly Automotive Stores, Inc.*, 940 F. Supp. 2d 850, 866 (C.D. Ill. 2013) (quoting Joint Congressional Statement on 1984 Trademark Counterfeiting Legislation, 130 Cong. Rec. H12079). Despite this loophole, licensees are liable for use of a counterfeit mark when the incident alleged to be infringing occurs after the infringer no longer had authorization to use it. *Id.*

For its part, CT alleges that it met the pleading standard for a Lanham Act counterfeiting violation. It states that in its complaint, it specifically alleged that PRP, PRT, and Ware continued to manufacture, market, and sell products with the Coin-Tainer name, likeness, and mark in 2019 after the expiration of the manufacturing license expired. CT's complaint does allege that PRP, PRT, and Ware manufactured, sold, and shipped products bearing the Coin-Tainer mark in 2019 to customers. CT even names a

specific company, Regent, to which Defendants manufactured, sold, and shipped product bearing the mark in 2019. CT then states that Defendants are still doing business as and representing themselves as CT by accepting purchase orders in the name of CT.

The Court turns to the question of whether CT has pleaded enough facts in its complaint to make it plausible that PRP, PRT, and Ware manufactured and shipped counterfeit goods. Defendants hint at continuing to at least ship, market, and sell products bearing the mark after the license expired. They state that it is "not sufficient to merely allege facts that would show that the goods were improperly sold or shipped." Defendants are mistaken. In the SAC, CT included language it claims is from the agreement that expressly forbids shipping as of January 2019. That would mean that Defendants no longer had the authorization to ship and were therefore infringing after that date. CT states that it knows a buyer, which it specifically named, that received products manufactured in 2019 by Defendants with the mark. Taken as true, the facts lend reasonableness and plausibility to CT's allegation that Defendants shipped and manufactured products bearing the mark in 2019. Therefore, both of Defendants' Lanham Act arguments fail.

II.     **Breach of Contract Claim**

    **A. Applicable Law**

The Court applies Illinois law because that is where the suit was filed and because both parties have applied Illinois law. *See Ryerson Inc. v. Federal Ins. Co.*, 676 F.3d 610, 611-12 (7th Cir. 2012). In Illinois, courts interpret the meaning of unambiguous terms of a contract as a matter of law. *See Air Safety Inc. v. Teachers Realty Corp.*, 185 Ill. 2d

457, 462 (Ill. 1999). When construing a contract, traditional contract interpretation principles in Illinois require that a court ascertain and give effect to the intent of the parties. *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 757 (Ill. App. 1st Dist. 2004). Under Illinois law, a defendant is liable for breaching a contract if (1) there is an existing valid and enforceable contract; (2) performed substantially by plaintiff; (3) breached by the defendant; (4) and resulting in injury to plaintiff. *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015).

### B. Discussion

PRP and PRT allege that CT has not pleaded enough information to establish plausibility for its claim that PRP and PRT breached the agreement by using its GS1 Company Prefix and barcodes ("the GS1 Codes"). The GS1 Codes and Vendor Relationship Assets were initially owned by CT, but the parties dispute whether Defendants acquired the GS1 Codes and Vendor Relationship Assets when PRP and CT formed PRT. Defendants claim CT's contribution included the GS1 Codes and Vendor Relationship Assets, and that Defendants retained them under the terms of the agreement.

PRP and PRT focus on the breach element, asserting that CT must plead facts to support an inference that they failed to perform a duty set forth in the contract. Defendants argue that CT failed to identify a part of the contract that places a duty on them to stop using the GS1 Codes. CT counters by stating that the agreement contains language that required Defendants stop using Coin-Tainer name, brand, likeness, and goodwill, including the mark, after December 31, 2018, and that this language, although

not explicit, can be inferred to include the GS1 Codes and Vendor Assets, because they identify the brand to vendors and the public. CT claims that the agreement specifically required Defendants to "submit updated information to vendors for their use in their 2020 catalogs that does not include the names 'Coin-Tainer' or 'The Coin-Tainer Company'" and that the GS1 Codes do not need to be identified by name because it is inherent that this type of information would be updated as well (Doc. 57, p. 8).

Despite the complex nature of the relationships between the entities, what they agreed to when they merged, and what they agreed to when they split, the question again goes back to the plausibility of CT's facts contained in the complaint. While the parties may wish differently now, the terms of the agreement related to the ownership of the CT GS1 Codes and Vendor Agreement are anything but unambiguous, which leaves ample room for the plausibility of CT's ownership of them after the relationship of the entities soured. Most convincingly, there are legitimate questions about what a name, brand, likeness, and goodwill entail that creates a frame of plausibility around the idea that CT may have intended to keep or regain those pieces of property. The requirement to send updated information to the vendors for 2020 in the agreement also lends itself to this idea, reasonably showing a desire to regain their business identity in full. Therefore, Defendant's breach of contract argument also fails.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** PRP, PRT, and Ware's Motions to Dismiss (Docs. 59, 73).

**IT IS SO ORDERED.**

**DATED:** March 3, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**