IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THE COIN-TAINER COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-CV-00234-DWD |
| | ) | |
| PAP-R PRODUCTS COMPANY, | ) | |
| PAP-R-TAINER, LLC, and | ) | |
| SCOTT WARE | ) | |
| | ) | |
| Defendants. | | |

**MEMORANDUM & ORDER**

**DUGAN, District Judge:**

Coin-Tainer Company, LLC ("Coin-Tainer") and Pap-R Products Company ("PRP"), once market competitors in the business of the manufacture and sale of paper products for storing and handling of coin currency, entered into a joint venture that quickly evolved into the Illinois limited liability company, Pap-R-Tainer, LLC ("PRT"). Unfortunately, conflict developed between the members and the joint venture began to devolve almost from its inception. Not long thereafter, litigation ensued. The litigation between the members ended, at least temporarily, with the settlement of that lawsuit. But even the settlement did not go as planned, and the Plaintiff instituted this lawsuit naming, in the process, an additional Defendant, Scott Ware, as the sole owner of PRP. The Defendants responded in kind with counter-claims of their own.

Initially, Coin-Tainer's Third Amended Complaint (Doc. 103) (the "Complaint") included claims for trademark counterfeiting (Count I), trademark infringement (Count II), federal unfair competition and false designation of origin (Count III), breach of

1

contract (Count IV), and defamation (Count V). Defendants filed motions for partial summary judgment on Counts I through V of the Plaintiff's Third Amended Complaint. (Docs. 147-149). This Court granted the Defendants' motions such that only Count IV presently survives. At issue before this Court is whether the testimony of Plaintiff's damages expert, Fernando Torres, should be excluded for lacking relevance to Count IV of Plaintiff's Complaint.

### PROCEDURAL AND FACTUAL BACKGROUND

Count IV of the Plaintiff's Complaint alleges that the settlement agreement provided that the Defendants, Pap-R Products and Pap-R-Tainer, agreed to return to the Plaintiff "anything [bearing] the Coin-Tainer name" (Doc. 103, ¶ 94) and "to cease using the Coin-Tainer tradenames, trademarks and doing business as Coin-Tainer by December 31, 2018." (Doc. 103, ¶ 95). Plaintiff claims that the Defendants breached the Settlement Agreement by: (1) continuing to use Coin-Tainer's brand, tradename, trademarks, goodwill, vendor status and by continuing to do business as Coin-Tainer; (2) selling and shipping product containing the Coin-Tainer Marks; and (3) by not returning everything bearing the Coin-Tainer name. (Doc. 103, ¶¶ 97, 98, and 99).

The obligations of PRP under the Settlement Agreement are set forth in paragraph 5. It provides that PRP pay $200,000 to Coin-Tainer in exchange for one hundred percent of Coin-Tainer's interest in PRT, thereby making PRP the sole owner of PRT. (Doc. 153-1, p. 3). Upon payment of the $200,000, PRP purchased all of the "CT assets and liabilities of PRT," and any debt owed by Coin-Tainer or its affiliates to PRT was to "be considered

fully discharged at the time of the payment of the Purchase Price." (Doc. 153-1, p. 3-4). Section 5 of the Settlement Agreement also grants PRT and PRP a "temporary, exclusive, royalty-free license" to use the names "Coin-Tainer" and "The Coin-Tainer Company" (the "CT Trade Names") from October 26, 2018 to December 31, 2018 and prohibits Coin-Tainer from using those names in the United States during that time. (Doc. 153-1, p. 3). After December 31, 2018, Coin-Tainer would become entitled to the sole rights "to all variations of the CT trade names." At that time, Defendants were required to cease "ship[ping] products containing the name 'Coin-Tainer' or 'The Coin-Tainer Company'". And to return all such products to Coin-Tainer. (Doc. 153-1, p. 3).

However, by the terms of the Settlement Agreement, (as discussed in detail in this Court's Memorandum and Order of April 26, 2021 (Doc. 176)) the Plaintiff received via the Settlement Agreement no intellectual property beyond the trade names "Coin-Tainer" and "The Coin-Tainer Company". This Court then determined that summary judgment on all counts but Count IV was appropriate. With that determination went all of the Plaintiff's claims for damages related to intellectual property except that for Defendant's use of the Coin-Tainer and "The Coin-Tainer Company trade names. That claim includes the allegations that the Defendants used "the Coin-Tainer" and "The Coin-Trade Company tradenames" through shipping of products and the failure to return the legacy bags as called for in the Settlement Agreement. (Doc. 103, ¶¶ 97, 98, and 99). In its Memorandum and Order addressing the motions for summary judgment, this Court stated: "However, whether this breach caused damages above and beyond the value of the packaging – that is damages for continued use of the tradename – presents questions

of fact that cannot be resolved by the current record." (Doc. 176, P. 21). The present issue is one of whether Mr. Torres' proffered testimony is relevant to the remaining Count IV claims given this Court's prior Order.

Defendants move to exclude the testimony of Mr. Torres under Rule 702 of the Federal Rules of Evidence (Fed. R. Evid. 702) and the gatekeeping principles announced in *Daubert v Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). They argue that because this court left remaining only the breach of contract claim, Mr. Torres' testimony is now irrelevant as he did not speak in his Rule 26 disclosure or deposition to damages associated with the value or use of the "legacy bags". (Doc. 179, P. 2)[1] Plaintiff responds by asserting that Mr. Torres will not be testifying regarding the value of the legacy bags but "must be allowed to extrapolate his analysis based on information analyzed and identify the gross and incremental profits enjoyed by Defendants for those accounts which are associated with the continued use of Plaintiff's trade name." (Doc. 182, P.4)[2]

## LEGAL STANDARDS

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), govern the admission of expert testimony in federal courts. Rule 702 provides:

---

[1] The terms "Legacy Bags" or "Legacy Packaging" are the parties' references to packaging materials bearing the name "Coin-Tainer" that belonged to the Plaintiff but not returned by the Defendants after January 1, 2019 per the Settlement Agreement.

[2] Plaintiff indicates that "Mr. Torres will not be opining on the damages associated with the Legacy Packaging" and that "Plaintiff will prove its damages related to the Legacy Packaging without the need for expert testimony". (Doc. 182, P. 3)

4

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule requires that the expert testimony both assist the trier of fact and be of sufficient level of reliability. To those ends, the district court operates as the gatekeeper of expert testimony. In fulfilling that role, the judge is to be mindful that "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (Citations omitted). The inquiry must "focus … solely on principles and methodology, not on the conclusions they generate." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (Citing *Daubert*, 509 U.S. at 595).

*Daubert* provides several guideposts for determining reliability. These guideposts examine (1) whether the theory has been or can be tested; (2) whether the theory has been subjected to peer-review and/or academic publication; (3) whether the theory has a known rate of error; and (4) whether the theory is generally accepted in the relevant community or discipline. *CW, ex rel. Wood, at 835*; *Schultz*, at 431. (citing Daubert, 509 U.S. at 593–94, 113 S.Ct. 2786). This list is neither exhaustive nor mandatory. *Chapman v. Maytag Corp. (In re Chapman)*, 297 F.3d 682, 687 (7th Cir.2002). In some cases, it may also be appropriate to examine whether there is "too great an analytical gap between the data and the opinion proffered." See *General Electric v Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512,

5

519. Ultimately, reliability is determined on a case-by-case basis. *Ervin v. Johnson & Johnson*, 492 F.3d 901, 904 (7th Cir.2007).

## ANALYSIS

**I.     The Report and Testimony of Fernando Torres, Chief Economist**

Mr. Torres' "Damages Expert Report of Fernando Torres" (Doc. 146-2) ("Report") sets forth his qualifications, his assessment of the "case background", a statement of the "Economic Role of Trademarks" and damages analysis. His report addresses a variety of damages including those related to the now-dismissed trademark and trade Dress infringement claims. The report states: "To assess economic damages, a necessary assumption is that liability for the alleged infringement will have been found by the trier of fact." (Doc. 146-2, P. 8)   It goes on to provide that "in assessing profits, the Plaintiff is required to prove Defendant's sales only". (Doc. 146-2, P. 9)  In preparation of the report, Mr. Torres "reviewed and considered the document production relating to the Defendants' sales to determine, first the amounts of accused sales and, second, a first approximation to Defendants' "profits on those sales." *Id*.  He notes that "PRP's sales reports identify for each month the item number (including description and unit of measure), the customer (both customer number and name), the posting date of the transaction as well as the quantity invoiced, the amount as well as a profit amount and profit margin per item/customer." *Id.*

Mr. Torres addressed the "Contract Breach Only" and included within that category "[s]ales to customers using proprietary branding on the product, including the

6

Coin-Tainer SKU identifiers which are claimed to be Coin-Tainer Company products." *Id.* He then purportedly reviewed the sales reports and processed the information to identify the sales by month and customer. This process generated a compilation in the form of a table depicting the total amount of sales for a period of 20 months starting in January 2019 for each of five retailers or distributors, Office Depot, SP Richards, Staples, Walmart of and Essendant. The total "Defendant Pap-R Products Sales amount to $6,318,647" according to Mr. Torres. (Doc. 146-2, P. 11-12) Using "the weighted average margin" of profit for each customer, Mr. Torres claims that the Defendants enjoyed a profit of $4,674,746 as a result of the alleged breach of contract. (Doc. 146-2, P. 12-13).[3]

Whatever may be gleaned from Mr. Torres' report it is clear that his assumptions and analyses are based on his belief that all of the Plaintiff's claims, including those for trademark infringement, trademark counterfeiting, and breach of contract, would survive. And, importantly, he does not differentiate between revenues or profits flowing from trademark and trade dress infringements and trade *name* use, the latter of which is a right that belongs to the Plaintiff. As a result, his report is necessarily speculative as to damages caused by any breach of the Settlement Agreement by reason of the Defendants' inappropriate use of the trade names "Coin-Tainer" and "The Coin-Tainer Company". And, nothing in his report or deposition suggests that he has employed a reliable process to winnow damages related to the existing claims from those for the now-dismissed

---

[3] Mr. Torres does continue with his analysis by providing for a deduction for incremental profits based on his assessment and application of incremental costs. (Doc. 146-2, P. 14-15) However, extensive reference to that analysis is unnecessary for our purposes here.

claims. Rather he includes within the "Contract Breach Only" those "sales to customers using proprietary branding on the product, including Coin-Tainer SKU identifiers" which he believed at the time he authored the report were "Coin-Tainer products". (Doc. 146-2, P. 9)

It is clear from Mr. Torres' deposition testimony that a central assumption in his calculation of damages was that liability for the wrongful use of the trademark and trade dress by Defendants was certain. (Doc. 179-2, P. 60, 70) Another assumption central to his opinions is that the SKU numbers depicted in the sales records reflected sales of products trademarked for the Plaintiff. (Doc. 179-2, Pp. 70-71, 91) That assumption propagated a further assumption that the sales made by Pap-R Products were, in fact, sales that the Plaintiff would have enjoyed had there been no infringement or breach of contract. (Doc. 179-2, P. 87). And, significantly, Mr. Torres' was unable without additional information to sort out damages for either the trademark infringement or the trade dress. (Doc. 179-2, P. 96).

Defendants do not contest that Mr. Torres is qualified or that his technical expertise and experience as an economist can help a trier of fact to understand economic loss evidence or determine a fact in issue. Rather, the Defendants argue that his testimony is not relevant to any issue remaining in the case. "No matter the nature of the witness's expertise, Rule 702 establishes a standard of evidentiary reliability, requires a valid … connection to the pertinent inquiry as a precondition to admissibility, and mandates that the testimony have a reliable basis in the knowledge and experience of [the relevant] discipline." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013).

Thus, the hurdles that must be cleared by an expert's testimony include both relevancy and reliability. Here, the remaining claims are based on an alleged breach of contract through the Defendants' use of the Plaintiff's trade name and the value of the legacy bags.[4] Unfortunately, Mr. Torres' assimilation, calculation and analyses of the sales provided the foundation on which he built his "primary opinion" regarding damages attributable to claims that no longer exist. (Doc. 179-2, P. 88) Mr. Torres' has not offered any opinion with regard to the profits generated or damages suffered solely from the alleged use of the trade *name*. In fact, it is not clear that that he attributed any damages to the use of the trade *name*. But, to the extent that his opinions are inclusive of still-pending claims, they can give no meaningful and reliable guidance to the jury without their separation from the irrelevant data concerning trademark and trade dress infringement. And, according to Mr. Torres, this separation cannot be done without the collection of yet more data and, therefore, further analysis and new opinions. (Doc. 179-2, P. 96) Indeed, he stated that he does not have a basis to analyze and "determine the value any rights that were retained by the defendants after the [S]ettlement [A]greement." (Doc. 179-2) See *Manpower, Inc*. at 808 ("This is not to say that an expert may rely on data that has no quantitative or qualitative connection to the methodology employed.") *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) ("Rule 702's reliability elements require the district judge to determine only that the expert is providing testimony that is based on a

---

[4] The fact that Mr. Torres employed forensic assumptions or methodology is not at issue. Indeed, the formulation and use of assumptions is not foreign to forensic economic analyses and forecasts, and lost profits are not uncommonly proven by the collection and assimilation of revenue information from a defendant's financial records. Nor is there an assertion that his assumptions are "vulnerable" or even "inconclusive". (See Stollings v. Ryobi Techs., Inc., 725 F.3d 753, 766 (7th Cir. 2013)

9

correct application of a reliable methodology and that the expert considered sufficient data to employ the methodology.") *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008) (refusing to reverse the district court's exclusion of an accountant's opinions where underlying data is incomplete.)

So, presently, there is an analytical disconnect between the existing data and Mr. Torres' pertinent opinions and, as such, his opinions regarding damages for trademark and trade dress infringement are not probative on the issue of damages for breach of contract as it related to Defendants' use of the trade *name*.

The Plaintiff nevertheless argues that this court should allow Mr. Torres to testify "within the confines of the [April 14, 2021] Order" (Doc. 182, P. 3) and suggests that his report itemizes a number of checks from 2019 and 2020 that are made payable to "Coin-Tainer, Co LLC". (Doc. 182, P. 4; Doc. 168-4 and 5). Plaintiff then asserts that these checks were payment for sales "Defendants transacted using the Coin-Tainer trade name." (Doc. 182, FN 3). There are problems with Plaintiffs' argument. First, as noted above, Mr. Torres' does not in either his report or testimony distinguish those damages associated with what he thought to be a trademark or trade dress infringement from those damages flowing from breach of contract resulting from the use of the trade *name* or Coin-Tainer. Second, he fails to render any opinions as to the generation of revenue by Defendants or the loss of profits suffered by Plaintiffs because of the Defendants' use of the trade name. And, if the checks in question were mistakenly or intentionally received and deposited by Defendant, it is not alleged in Count IV. For the same reasons stated above, Mr. Torres

should not be permitted to testify as to the damages resulting from the alleged use of the trade names.

## II.     Plaintiff's Motion for Reconsideration

The Plaintiff, in its response brief to the present motion, made the following comment regarding this Court's Order of April 26, 2021:

> The Order is inherently flawed and should be reconsidered. Coin-Tainer is the trade name. Coin-Tainer® is the trademark. Plaintiff cannot have "the sole rights to all variations of the CT trade names" if Defendant retained the trademark "Coin-Tainer". Under the Court's interpretation, the parties' respective rights cannot co-exist and leads to an absurd result.

(Doc. 182, FN. 2)

To the extent that Plaintiff's comment in FN 2 was intended to be a motion to reconsider, the same should be denied. The Federal Rules of Civil Procedure do not expressly recognize motions to reconsider. Rule 54(b) allows district courts to revisit "any order or other decision . . . that adjudicates fewer than all the claims" in an action and to revise it at any point before the entry of judgment as justice requires. FED. R. CIV. PROC. 54(b); see also *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 12 (1983) (noting that "every order short of a final decree is subject to reopening at the discretion of the district judge.").

Motions to reconsider interlocutory orders under this rule "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (internal quotations and citations omitted). "A manifest error is not demonstrated

11

by the disappointment of the losing party. It is the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (internal quotations and citation omitted). Because the standards for reconsideration are exacting, the Seventh Circuit has stressed that appropriate issues for reconsideration "rarely arise." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (internal quotations and citation omitted).

Although the Plaintiff offers nothing by way of reference to a "manifest error" or "wholesale disregard, misapplication or failure to recognize controlling precedent", some comment is not uncalled for. The Court does not necessarily disagree that some might well view the Plaintiff as having experienced a less-than-ideal or even curious result, but any absurdity started and ended with the terms agreed to in the Settlement Agreement. The disjunction of the term "trade name" from all other intellectual property descriptions did not originate in this Court's Order but rather its origins are found in the terms of the agreement itself. And, merely because one party to a contract received something far removed from that which he wanted, that disappointment does not require the Court to add precision to the document or correct a scrivener's inattention to detail by rewriting the terms. See *Guarantee Tr. Life Ins. Co. v. Platinum Supplemental Ins., Inc.*, 2016 IL App (1st) 161612, ¶ 30, 68 N.E.3d 481, 489 ("The contractual language must be given its plain and ordinary meaning and the court cannot make a new contract by supplying provisions or by giving plain and unambiguous language a distorted construction.") As such, Plaintiff's Motion to reconsider should be denied.

Disposition

Defendants' Renewed Motion to Exclude the Testimony of Fernando Torres under Daubert v Merrell Dow Pharms, Inc. (Doc. 179) is hereby **GRANTED.** Plaintiff's Motion to Reconsider as set forth it its Memorandum of Law (Doc. 182) is hereby **DENIED**.

So Ordered

Entered this the 9th Day of September 2021

*/s/ Daniel W. Dugan*

———————————————
David W. Dugan
U.S. District Court Judge